

FILED

JAN 2 5 2008

PATRICK E. DUFFY, CLERK
By_____
DEPUTY CLERK, MISSOULA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 07-37-M-DWM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM IN SUPPORT |
| | ) | OF PROBATIONARY SENTENCE |
| TOM LANROSE, | ) | |
| | ) | |
| Defendant. | ) | |

## I.  Introduction

Defendant Tom Lanrose was charged on May 18, 2007, with possession of firearms during and in relation to a drug trafficking crime (Count I) and possession of a sawed-off shotgun (Count II).  Following the denial of his motion to suppress, Lanrose entered a plea of guilty to possession of a sawed-off shotgun in exchange for the Government's motion to dismiss Count I.  Pursuant to the plea agreement, Lanrose waives his right to appeal if the sentence is less than 36 months incarceration, and

1

the Government waives its right to appeal if prison time exceeds 51 months.  For the reasons that follow, it is the judgment of the Court that a sentence of 36 months probation with six months of house arrest is reasonable in this case.

## II.  Factual Background

Defendant Tom Lanrose moved with his wife Karen to the Bitterroot Valley in 1997.  Both believed that the passing of the millennium in the year 2000 posed a serious risk of disaster, civil strife, breakdown of societal order, and loss of essential services, and they moved to Montana to build a new home to meet their perceived need for disaster preparedness.  Lanrose designed and built the home himself, incorporating a sophisticated hidden underground shelter.  The shelter contained a food supply, water purifier, emergency generator, medical supplies, communication electronics, radiation detection and protection equipment, emergency currency, and firearms.  The existence of the shelter was known to the couple's friends and neighbors, and Lanrose and his wife stocked the shelter with extra food for his less prepared neighbors.  The couple maintained the shelter even after the millennium passed uneventfully, as they continued to believe in the importance of preparedness and self-reliance.

In 2001, Lanrose was working as a commercial helicopter pilot when he was injured in a crash in Sardinia, Italy.  He suffered damage to his cervical/thoracic spine, his feet and his

2

right knee.   Lanrose received payment for a 35 percent permanent disability through workman's compensation due to his injuries in the crash.   Lanrose, his wife and mother all state that he has dealt with chronic back pain since the crash in 2001.   Lanrose is unable to tolerate the side effects of most prescription pain medications.   He underwent hydrotherapy for chronic pain management and decided to begin cultivating marijuana for pain management purposes.   Following the State of Montana's passage of a medical marijuana initiative in 2004, Lanrose tried unsuccessfully to obtain a physician's approval for the use of medical marijuana.   Lanrose continued cultivating after his efforts to get approved failed.

Law enforcement first began to suspect Lanrose of growing marijuana in January 2004, when a package addressed to Tom Lanros (the Defendant added the "e" to the end of his last name later in life, and both spellings appear in the letters in aid of sentencing filed on Lanrose's behalf) was delivered to a real estate office in error.   The recipient opened the package and, finding marijuana seeds inside, alerted law enforcement. Officers were not able to locate Lanrose from the address information found on the package, despite the fact that he had sent a letter to the Ravalli County Sheriff's Office in 1999 asking that law enforcement not patrol in or around his private cul de sac at night.   Lanrose wrote a second letter in August of

3

2004, in which he again complained about law enforcement on his private land.  He wrote, "unless you are investigating a crime or are invited onto private property, could you please instruct your deputies not to park, have lunch, make cell phone calls, etc." on his private property.

A month later, Lanrose encountered an off-duty police officer in his private cul de sac.  According to Paragraph 5 of the Presentence Report, "the Defendant was aggressive and confrontational regarding the officer being on his private property."  No explanation is evident for the off-duty officer's presence on Lanrose's property one month after Lanrose wrote to ask that law enforcement respect his property rights.  Although there is no indication that Lanrose committed any offense during the confrontation, the off-duty officer ran a check on Lanrose's license plate.  Once they learned that Lanrose lived at the property, officers conducted three garbage searches and discovered a number of items relating to the production of marijuana.

The information found in the Defendant's trash was used to obtain three search warrants, which were executed on March 29, 2005.  Officers found a marijuana grow operation in hidden rooms linked by a corridor to the Defendant's disaster shelter.  The search yielded eight plants, some packaged marijuana, a suspected THC synthesis lab, professional grade chemistry glassware, and

4

books and manuals on marijuana cultivation.   Officers found two semi-automatic assault rifles, one of which was hidden in a bench in the room that housed the generator used to power the grow operation.   The other was near the disaster shelter.   A shotgun was found over the doorway into the garage area, and other guns and ammunition were found in the disaster shelter.   Officers found the sawed-off shotgun that is the basis for this prosecution under a window in the second-floor master bedroom.   A flashlight was mounted on top of the barrel.[1]   Officers seized all of these items, as well as the Defendant's alchemy equipment and $6,000 in silver coins.

Lanrose was charged in Ravalli County with several drug-related offenses, and eventually pled guilty to Criminal Production or Manufacture of Dangerous Drugs and Use of Possession of Property Subject to Criminal Forfeiture.   He was incarcerated for 43 days pending sentencing.   Pursuant to a plea agreement, Lanrose received a six-year deferred imposition of sentence and was placed on state probation on October 19, 2005. He was ordered to pay a fine, with his period of pre-sentence incarceration counting toward the fine at $55.00 per day. Lanrose was also required to forfeit all of the property seized

---

[1]Lanrose received the shotgun from an elderly woman for whom he was performing some home maintenance.  He discovered the shotgun in the attic of the home and, when he informed the owner of its presence, was asked by her to remove the weapon from the home and take it with him.  Lanrose mounted the flashlight to the barrel after he received the shotgun.

during the search.   The plea agreement contained the county
prosecutor's statement that the Defendant's punishment is an
appropriate resolution of all matters, state and federal,
stemming from the incident.

The state district court stated the following in imposing
sentence:

> ... The Defendant, at age fifty-three, has no prior
> criminal history of any sort, these being the
> Defendant's first lifetime criminal charges, which are
> nonviolent offenses.
>     The Court further finds that this offense involved
> the Defendant cultivating a marijuana crop in his home,
> although there is no real indication that this was for
> anything other than personal consumption.   The
> Defendant does have legitimate chronic pain issues
> resulting from back injuries sustained in a helicopter
> crash.   It does appear to the Court that the Defendant
> was attempting to self-medicate for physical pain, but
> without the compliance of the medical marijuana law.
> The Defendant has forfeited personal property of
> significant value to law enforcement authorities.

The Defendant's wife initiated divorce proceedings against
him after his arrest.   They were divorced by the time of his
sentencing.   Pursuant to the plea agreement, he forfeited much of
his personal property, including his firearms, alchemy equipment,
and $6,000 in silver.   Lanrose lost his pilot's license, and
thereby lost his primary means of earning a living, as a result
of his arrest and conviction.   According to Paragraph 81 of the
Presentence Report, Lanrose quitclaimed his interest in the house
he built to his now ex-wife to compensate her for her arrest and
detention.   Lanrose reports, and his ex-wife confirms, that she

6

paid a $100,000 fine to Ravalli County in lieu of surrender of the home.  She now has the home listed for sale.  Lanrose has returned to Washington and lives with his mother, who supports him.

Lanrose maintained a clean record on state supervision from his sentencing in October 2005 until he was indicted in this case on May 18, 2007.

A psychological evaluation of the Defendant by Dr. William D. Stratford concludes that Lanrose suffers from post-traumatic stress disorder, persistent depression and anxiety, and persistent physical pain.  Dr. Stratford describes Lanrose as a "shy, avoidant, suspicious, fragile, [and] intellectualized" man who "maintains interpersonal distance."  Lanrose was found to lack violent or aggressive tendencies.  Dr. Stratford expressed his opinion that Lanrose would fare poorly in a prison environment due to "his inherent vulnerable, avoidant personality, suspiciousness, chronic pain, and his incredible level of anxiety, which, as I indicated, has reached levels that I have rarely seen in 35 years of practice."

### III.  Sentence

**A.    Guideline calculation**

The base offense level for the Defendant's crime is 18.  The Presentence Report recommends a four-point specific offense characteristic increase under U.S.S.G. § 2K2.1(b)(6), addressing

7

possession of a firearm or ammunition in connection with another
felony offense.  In order for the enhancement to apply, the
Government must prove that the firearms "facilitated or
potentially facilitated-i.e., had some emboldening role-in the
defendant's felonious conduct."  United States v. Collins, 90
F.3d 1420, 1430 (9th Cir. 1996) (quoting United States v. Routon,
25 F.3d 815, 819 (9th Cir. 1994)).  There must be a "'connection'
between the use or possession of the firearm and the underlying
offense."  United States v. Polanco, 93 F.3d 555, 565-66 (9th
Cir. 1996).[2]

The Presentence Report argues for the application of §
2K2.1(b)(6) because of the placement of the weapons.  The Report
notes that with the exception of the saw-off shotgun, the weapons
were located in the vicinity of the grow operation, "allowing an
inference they were to protect the marijuana grow operation."
The location of the sawed-off shotgun below the second story
window also supports such an inference, the Report argues,
apparently because the window beneath which the weapon was found
overlooks the only means of approaching the residence, suggesting
a defensive posture.  The Report's emphasis on the placement of
the weapons is based on United States v. Ferryman, 444 F.3d 1183
(9th Cir. 2006), in which the court upheld the district court's

---

[2]The Collins, Routon and Polanco cases discuss U.S.S.G. §
2K2.1(b)(5), which is how the provision at issue was numbered until
November 1, 2006, at which time it was re-numbered § 2K2.1(b)(6).

finding that the defendant's weapons were placed "in the classic defensive posture consistent with protection of a marijuana grow operation."  Id. at 1186-1187.

Ferryman is inapposite for two reasons.  The issue before the court in Ferryman was the meaning of the phrase "in connection with" as used in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2.  The court made clear that it was not interpreting the enhancement provision that is at issue here, stating, "[The cases cited by the defendant] discuss a sentencing enhancement under U.S.S.G. § 2K2.1(b)(5), which has no application to this case."  444 F.3d at 1186.  Moreover, both the district and appellate courts in Ferryman ruled against the defendant due to the implausibility of his alternate explanation for possessing the firearms.  The defendant attempted to persuade the court that he had the weapons to protect his family, while admitting that his house was twice burglarized by intruders likely lured by the marijuana grow operation.  Id.

Not only is Ferryman inapplicable to an enhancement under § 2K2.1(b)(6), it is distinguishable from this case on its facts because the Defendant in this case has a very plausible alternate purpose for the firearms he possessed, one which pre-dates the establishment of his personal-use grow operation.  The Presentence Report and the Government both emphasize the strategic placement of the firearms near the Defendant's grow

9

operation.  What they fail to acknowledge is the proximity of the grow operation to the Defendant's disaster shelter.  Lanrose knew that it was illegal for him to grow marijuana; it is unsurprising that he chose to conceal his operation, and the hidden rooms near the shelter were a natural place for him to store the contraband. It does not necessarily follow that the firearms kept in that area facilitated or emboldened the grow operation, particularly when the evidence is that Lanrose possessed the weapons to protect his home and acquired them prior to beginning his cultivation efforts.

The Government argues that, in addition to placing his arms strategically in his home and manifesting a concern about law enforcement, "Lanrose was more generally imbued with anti-government sentiment that – in combination with his firearms, the construction of his home, and his marijuana experimentation – suggest intent to possess and use firearms against law enforcement."  Nothing about the Defendant's marijuana experimentation suggests an intent to possess and use firearms against law enforcement.  In fact, none of the Defendant's conduct indicates an intent to use firearms against law enforcement.  To the contrary, when law enforcement approached or encroached upon his private property, the facts show that Lanrose responded not by taking up arms, but by picking up a pen.  When an off-duty officer materialized on the Defendant's property one

month after he wrote to ask that law enforcement not come onto
his private property, Lanrose did not brandish a firearm.

The Government asserts that "[k]eeping a sawed-off shotgun
by a window overlooking the approach to the home in 2005 was not
about Y2K." The statement is obviously true from a temporal
perspective, but the mere fact that the sawed-off shotgun was not
Y2K-related does not mean that it was marijuana-related. The
Government cannot meet its burden by pointing to the calendar and
stating that because the Y2K threat has passed, Lanrose's reasons
for possessing the weapons must have been related to his grow
operation. By the Government's own characterization, Lanrose is
something of a loner with anti-government leanings. It is not
difficult to imagine that Lanrose continued to feel a need for
preparedness and protection even after the immediate threat he
perceived from the turn of the millennium had passed. The mere
passage of time is insufficient to convert the purpose of the
weapons from general home defense to protection of the grow
operation. All evidence is that the two are unrelated, save for
the location of the firearms near the grow rooms, which in turn
are near the disaster shelter.

The Government appears at times in its Sentencing Memorandum
to acknowledge that the Defendant's firearm possession is much
more likely related to his generalized anti-government views than
to his grow operation. The Government says of the Defendant's

11

firearm possession, "It was about Lanrose's view of government, his view of his own entitlement to break the law, and his view of rightfully defending himself under some species of natural law." That statement is accurate to some degree, but it ignores the purpose of the enhancement under U.S.S.G. § 2K2.1(b)(6). The enhancement increases the offense level if a firearm is possessed in connection with another felony offense. Acts can be felonies, but beliefs cannot. Hating the government is not a felony. Neither is believing in natural law or one's own entitlement to break the law. The Government hints at tax evasion in its Memorandum, but has not set forth any credible factual basis for finding that Lanrose committed felony tax crime. Apart from the offense of conviction, the only felony Lanrose committed is the act of manufacturing marijuana, which bears no relation to the anti-government beliefs that are listed by the United States as the reasons why Lanrose kept firearms.

The Defendant's actions and statements demonstrate without question that he would have possessed each of the firearms found in his home regardless of whether he began growing marijuana there. The Government has the burden to show by a preponderance of the evidence that despite this fact, the firearms emboldened the Defendant in some way as he began his grow operation. The Government has offered no evidence to support its position. The Government has persuasively argued that Lanrose is mistrustful

and perhaps disdainful of government, that he is intensely private, and that he has at times harbored fears about government and law enforcement that are not rational.  But it has not shown that he possessed any firearms in connection with his modest grow operation.  The four-point enhancement under U.S.S.G. § 2K2.1(b)(6) does not apply.

The base offense level is therefore calculated at 18, which along with the Defendant's Criminal History Category of I, results in a sentencing range of 18-24 months in prison followed by two to three years of supervised release.  A sentence of probation is available under the statute, ranging from one year to five years.  The Guidelines do not authorize a probationary sentence.

**B.   18 U.S.C. § 3553(a)**

The United States Supreme Court recently restated the post-Booker sentencing procedure to be followed by a district court in Gall v. United States, 128 S.Ct. 586 (2007):

> ...[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and initial benchmark.  The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue fro whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented.  If he decides that an outside-

13

Guidelines sentence is warranted, he must consider the
extent of the deviation and ensure that the
justification is sufficiently compelling to support the
degree of the variance.  We find it uncontroversial
that a major departure should be supported by a more
significant justification than a minor one.  After
settling on the appropriate sentence, he must
adequately explain the chosen sentence to allow for
meaningful appellate review and to promote the
perception of fair sentencing.

Id. at 596-97 (footnotes, internal citations omitted).  With
those instructions in mind, and having established the Guidelines
range at 18-24 months and considered the kinds of sentences
available, the factors set forth in 18 U.S.C.§ 3553(a) are
discussed in turn below.

    1.    **The nature and circumstances of the offense and the
        history and characteristics of the defendant**

Possession of a sawed-off shotgun is a serious offense.
Unregistered firearms kept in proximity to controlled substances
present a serious risk of danger to law enforcement and to the
public.  It is this danger that the statute under which Lanrose
was convicted is intended to prevent.  But just as it would be
improper for the Court to ignore that potential for danger when a
Defendant possesses an unregistered saw-off shotgun, so too would
it be improper for the Court to impose sentence without first
considering the unique circumstances of this case.

Defendant Tom Lanrose is a 55-year-old man with no criminal
history outside of the events leading to this prosecution.  He is
battling the continuing physical effects of a helicopter crash

14

suffered in 2001 as well as severe depression and anxiety.  He is
an unusual man, and most of the time he is suffering, whether it
be emotionally, physically, psychologically, or in some
combination of the three.  His history is one of a law-abiding
and productive citizen, although he is clearly suspicious of
others and harbors a generalized hostility toward government.
His offense is possessing an unregistered shotgun with a barrel
two inches shorter than that which is permitted by federal law.
At the time that he possessed the weapon, he was growing
marijuana in his home for his personal use to manage chronic
pain.  This factor weighs in favor of a sentence below the
Guideline range.  While firearm crimes are a serious matter
generally, particularly where controlled substances are involved,
the two are unrelated in this instance.  Moreover, none of the
Defendant's illegal activities affected others.  He neither
distributed drugs nor brandished or used his firearm in any way.

**2.   The need for the sentence imposed to reflect the
        seriousness of the offense, to promote respect for the
        law, and to provide just punishment for the offense**

This factor weighs strongly in favor of a probationary
sentence.  The state officials who addressed the Defendant's
crimes in the first instance deemed a sentence of probation to be
an adequate and just punishment for all of the Defendant's
illegal conduct.  That sentence accurately reflects the
seriousness of the offense.  The judgment of the state prosecutor

and sentencing judge are important here because they approached
the case contemporaneously and with a local perspective as
representatives of the community that was most likely to be
affected by the Defendant's actions.  Lanrose has performed very
well on probation, validating the judgment of the prosecutor and
sentencing court that he posed a low risk to re-offend and no
danger to the community.  Under these circumstances, the federal
government's decision to initiate a second prosecution more than
two years after the Defendant's arrest and eighteen months after
he was sentenced is not easily understood.  The contemporaneous
and localized judgment of the Ravalli County authorities in this
case is likely to be superior to the stale and detached judgment
of the United States Attorney.  Taking Lanrose off of probation
and placing him in federal custody for eighteen months—at great
expense to the taxpayer—would not promote respect for the law.
It is more likely to promote a lack of faith in the ability of
the federal courts to reach a just result.

**3.    The need for the sentence imposed to afford adequate
       deterrence to criminal conduct**

There is no need to further deter this Defendant.  His
actions have destroyed his life and he has shown no sign that he
requires further punishment to prevent him from re-offending.  A
sentence of incarceration may deter others who have committed or
are considering committing a similar offense.  Thus, while
considerations of specific deterrence do not suggest that

16

incarceration is necessary, a sentence of incarceration may be useful as a general deterrent.  This factor does not weigh strongly in either direction.

**4.    The need for the sentence imposed to protect the public from further crimes of the defendant**

The facts of this case suggest that Lanrose presents no greater threat to the public than the average person.  The evaluation by Dr. Stratford confirms this in its finding that Lanrose is not a violent or aggressive man.  The Government argues that Lanrose is potentially dangerous because of the books he reads, the things he owns and the views he holds.  None of those considerations are as relevant in assessing the risk he poses as are his actions, which uniformly show that he is not a violent person.  His crimes were confined to his home.  The evidence is that when he was upset or irritated, he wrote letters.  When confronted on his property, he did not respond with violence or brandish a firearm, although Paragraph 5 of the Presentence Report indicates that the Defendant was "aggressive" when he found an off-duty Hamilton police officer on his land. Based on these facts, no incarceration is necessary to protect the public from future crimes of the Defendant.

**5.    The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

The Defendant has psychological and emotional health issues

17

and may have an alcohol problem.  He would likely benefit from treatment on all such matters, which would be available in federal prison.  It is not necessary to incarcerate Lanrose in order to provide him those treatment opportunities.  It is likely that he could receive equally effective treatment while on probation.  Pursuing the treatment outside of the prison setting is more desirable in light of Dr. Stratford's conclusion that prison life would compound the Defendant's difficulties due to his vulnerability, social awkwardness and anxiety.  Lanrose does not appear to have any educational needs.

      **6.    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

      This is the factor weighing most strongly in favor of a sentence of incarceration within the Guidelines range.  A hypothetical defendant with no prior criminal history, charged only with possession of an unregistered sawed-off shotgun, faces a sentence of 18-24 months in prison under the Guidelines. Lanrose is in some ways even less sympathetic than the hypothetical defendant, because Lanrose's firearm offense was contemporaneous with a marijuana grow operation, albeit a small one.

      The case can be made, however, that a disparity is warranted because many similarly situated people would not be prosecuted at all.  Given the inherent harshness of the Guidelines, which

mandate a minimum of eighteen months in prison when there would be no offense at all if the weapon was registered, one should assume that there are instances in which the proper exercise of prosecutorial discretion will mean no indictment is filed. Surely not every otherwise law-abiding citizen who happens to possess a firearm with a barrel of insufficient length should be imprisoned for a year and a half.  Perhaps a disparity is warranted because in most cases someone in Lanrose's position would be spared by a reasonable prosecutor.  Such acts of grace may be rare in the District of Montana—and this prosecution suggests that they are—but can be reasonably assumed to occur elsewhere, including under the circumstances presented here.

Nonetheless, the need to avoid disparate sentences weighs in favor of incarceration and against a sentence of probation.

### 7.   The need to provide restitution to victims of the offense

There is no victim of this offense.

### C.   Sentence

The factors identified for consideration in 18 U.S.C. § 3553(a) collectively weigh in favor of a sentence of probation. The Defendant is of advancing age, suffers serious physical, psychological and emotional problems, and presents little danger to the community and little risk to re-offend.  His performance for more than two years of state probation has been impeccable. As a result of his illegal conduct, he has lost his wife, his

home, his livelihood, and his property.  There is no good reason
to deprive him of his liberty at a cost to the taxpayer of
$24,443.08 per year.  He has been sufficiently punished.  He has
been adequately deterred.  For the reasons set forth above, a
sentence of probation is reasonable and appropriate in this case.
The sentence is imposed via written Judgment filed together with
this Memorandum.

Dated this __28th__ day of January, 2008.

_____
Donald W. Molloy, Chief Judge
United States District Court